JEAN E. WILLIAMS
Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

SALLY J. SULLIVAN (DC Bar No. 1021930)
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
4 Constitution Square
150 M Street NE
Washington, DC 20002
Tel: (202) 514-9269
Fax: (202) 305-0506
sally.sullivan@usdoj.gov

*Attorney for Defendants*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| ENVIRONMENTAL PROTECTION INFORMATION CENTER,<br><br>Plaintiff,<br><br>v.<br><br>ANN CARLSON, in her official capacity as the Forest Supervisor of the Mendocino National Forest; and the UNITED STATES FOREST SERVICE,<br><br>Defendants. | Case No. 3:19-cv-6643-EMC<br><br>**DECLARATION OF ANTHONY SABA IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER [ECF No. 18]** |

DECLARATION OF ANTHONY SABA  -  1

I, Anthony Saba, pursuant to Title 28, United States Code, Section 1746, declare as follows:

1.　　I am a Forester/Silviculturist for the Mendocino National Forest (Forest), which includes portions of the Berryessa Snow Mountain National Monument (Monument). I lead the vegetation program on the Forest and I have a wide range of duties related to the forestry, fuels and livestock grazing programs.  I have been a Forester/Silviculturist for the Mendocino National Forest since April of 2015.  I make this declaration of my own personal knowledge and I could and would testify to the truth of the facts stated herein if called upon to do so.

2.　　I have worked for the Forest Service since 2003.  Prior to my time working on the Mendocino, I was a Silviculturist on the Bighorn National Forest from 2008 until 2015 and was integral to timber and fuels activities on that Forest.  In 2010, I acquired a certification as Nationally Certified Silviculturist for the U.S. Forest Service.  This was a rigorous training that took two years to complete via both classroom training and a field certification on proposed silvicultural activities on a project I developed within mixed conifer forests of northern Wyoming.  As a Nationally Certified Silviculturist, I develop prescriptions and marking guides for timber and fuels projects removing trees and vegetation from the landscape via mechanical, hand, or fire activities.  From July of 2011 until December of 2011, I served a detail as a District Silviculturist on the Sulphur Ranger District of the Arapahoe-Roosevelt National Forest in Granby, Colorado, where I worked on projects associated with the historic, epidemic-levels of bark beetle mortality that were occurring in the northern Colorado mountains.  This effort consisted of extensive hazard tree abatement work alongside roads and trail networks.  Before my tenure on the Bighorn National Forest, I was part of the Forestry team on the Feather River District of the Plumas National Forest, where I started my career as a permanent employee for the Forest Service in May of 2007.  From 2003 through May of 2007, I worked various forestry

DECLARATION OF ANTHONY SABA  -  2

technician positions in both silviculture and sale preparation on the Medicine Bow-Routt and Rio Grande National Forests in Wyoming and Colorado, respectively.

3.      I received a Bachelor of Science degree in Forestry with a minor in spatial information management from Colorado State University in 2003.

4.      As a Forester/Silviculturist for the Mendocino National Forest, I am responsible for all facets of the forestry program; from project development and design to the administration piece(s) of those projects where accountable property such as timber or biomass removal is involved.  In my position, I write prescriptions for a variety of objectives within vegetation projects (including timber harvesting and prescribed fires) to effectively obtain desired future conditions set forth by the Mendocino National Forest Land and Resource Management Plan.  I work closely with all Forest specialists to ensure all concerns relative to their resources are addressed through design criteria, mitigation, and/or contractual clauses within timber, stewardship or service contracts consisting of vegetation management activities and I strategize on expenditures for current and future program endeavors.  I also perform quality control work on the ground to ensure layout, operational capabilities, target marking designations and any obstacles are identified, ensuring that all planned activities are practical, safe, and were authorized in the associated NEPA documentation.  I also have experience generating economic analyses and writing contractual provisions dictating timber and other vegetative activities.

5.      The Bartlett Roadside Hazard Tree Salvage sale removes trees on approximately 480 acres along Forest Service roads in the Bartlett Springs area northwest of the community of Lucerne, California.  This salvage sale addresses hazard trees that are located within 200 feet of the centerline Forest Service roads 16N01, 16N01D, 16N01F, 15N07, 15N07B, 15N22, 15N11, and county roads 303 and 220.  Hazard trees are identified according to standards set forth in the "Marking Guidelines for Fire-Injured Trees in California" (Smith 2011) and the "Hazard Tree

DECLARATION OF ANTHONY SABA - 3

Guidelines for Forest Service Facilities and Roads in the Pacific Southwest Region" (Angwin 2012).  The marking guidelines used for this Project were developed by renowned Entomologists and Forest Pathologists the Pacific Southwest Region Forest Health Protection Staff, based upon tree mortality models from the latest scientific research by the Forest Service.   The scientists who developed the guidelines are long-tenured in their field and well-qualified with the utmost credibility on their recommendations for tree removal associated with hazard tree abatement. The Fire-Injured Tree Marking Guidelines are used to determine mortality probabilities for trees impacted by wildfire.  The Hazard Tree Guidelines generally address trees near roads or infrastructure with phenotypic characteristics that lend themselves to compromising human safety and/or threatening property and infrastructure.  Trained field personnel used the 50 percent mortality probability category for fire injured-trees within the referenced guidelines and marked these trees blue on the ground in addition to trees that fall under the hazard tree guidelines near roads and facilities reference.  Trees that meet the 50 percent mortality probability category are trees that, based on the extent of their fire injuries, have a 50 percent or greater likelihood of dying from their injuries.  The 50 percent mortality probability standard was selected through discussions between Forest line officers (Forest Supervisor and District Rangers) and resource specialists early in the planning phase for the Ranch Fire Roadside Hazard Project to reduce hazard trees that may compromise safety along these roads and retain trees that have a greater than 50 percent chance of surviving.  According to the fire-induced mortality guidelines, projects around roads and infrastructure should utilize lower thresholds due to the fact that it is important with this type of effort to prevent leaving trees that may die due to our health and human safety objectives.  The Bartlett area was cruised and hazard trees were marked in January and February of 2019.  Since then, some hazard trees identified within the project area may have flushed green needles or ultimately succumbed to their injuries and died off during the spring and early

DECLARATION OF ANTHONY SABA  -  4

summer.  However, summer of 2019 and current field visits by the timber sale administration team have confirmed, the majority of trees that were marked for removal still fall within the removal guidelines.  As an example, the photo below was taken by Forest Service personnel in late September or early October 2019 and depicts at least two trees in the foreground that meet the percent crown kill criteria of 50% or greater for ponderosa pine. The tree in the immediate foreground has estimated 65% of the crown pre-fire now killed, but if you look between the darker green top and the area of dead foliage, the live foliage on those limbs is lighter, more sparse, and there is a conglomeration of needle cast from foliage that got scorched from the fire tangled up in the new foliage of those branches.  This 'band' of limbs has a width that encompasses approximately 20% of what was the existing total crown of that tree pre-fire.  From this visual estimate, the tree fell under both the pre-bud break marking guides of 80% or greater crown scorch for yellow pine and now shows, with approximately 65% of the pre-fire crown now killed, that this tree in the foreground falls under the post-budbreak removal guidelines.

DECLARATION OF ANTHONY SABA  -  5



Figure 1.  Photo taken in late September or early October of 2019 by USFS depicts ponderosa pine trees designated for removal in the foreground. The tree in the front has a crown kill proportion that qualifies it as a removal tree.  If tree does not qualify under fire-injured criteria, field personnel also need to ensure other defects and characteristics are not compromising the structural integrity of the tree where it would still qualify as a removal tree.

6.      I have reviewed Second Declarations of Kimberly Baker and Rene Voss and the exhibits filed therewith, including the email from Rene Voss to Sally Sullivan dated October 25, 2019, entitled "Photographs RE: EPIC v. Carlson - Proposed Call Monday to discuss issues with Bartlett Sale and potential TRO" ("Voss email"), attached as Exhibit 8 to the Second Voss Declaration.  I have also reviewed all of the photos posted at the link provided in that email.  I make this declaration primarily to respond to the allegations and photos contained in these documents, and in particular to the allegations in the Voss email attached as Exhibit 8 to the Second Voss Declaration.

DECLARATION OF ANTHONY SABA  -  6

7.      In the first allegation in the Voss email, Plaintiff alleges that "only merchantable trees are being felled, whereas smaller or unmerchantable snags/hazards along roads open to the public are being left." *See also* Second Voss Decl. ¶ 6.  Plaintiff makes its observation in the middle of the timber sale operations and ignores the significant work that still remains to be completed.  Per the timber sale contract, the contractor is not required to remove hazard trees smaller than 14 inches diameter at breast height (DBH), because the smaller dead trees do not qualify as merchantable sawtimber.  However, the contractor does have the option under the contract to purchase the smaller diameter material as biomass, as this material is subject to agreement.  While the contractor on the Bartlett sale has not yet exercised this option, it may still do so, at which point it would come back through the sale area to remove the smaller diameter hazard trees.  Any hazard trees that remain after the sale is completed, including any biomass removal if applicable, will be treated by the Forest Service either using a Forest Service force account, under service contracts, grants or agreements, or by other methods.  The Bartlett authorization includes the treatment of all hazard trees, not only those that are merchantable.  The Forest Service intends to treat all hazard trees under that direction.

8.      Plaintiff alleges in the second allegation in the Voss email that "many trees are marked that could never fall on the road and cause a hazard, especially down-slope trees that could not roll uphill after falling."  *See also* Second Voss Decl. ¶ 8.  Plaintiff ignores the fact that dead and dying trees on the downhill side of the road can still fall upslope.  Trees growing downslope from the road still usually grow upright, they do not always lean away from the road.  Events that can trigger failure of hazard trees include erratic winds, high winds, and situations where the ground is so saturated with water that roots lose stability.  Erratic wind, especially if there is heavy snow and ice in the tree branches that catch the wind, such as the windstorm just experienced by Northern California on October 25-27, 2019, can cause the tree to fall in almost

DECLARATION OF ANTHONY SABA  -  7

any direction.  Even trees leaning away from the road have been observed blown by winds onto the road.  Observations last winter showed that many trees had no visual signs of criteria being used for removal, yet still blew over due to fire-weakened root systems.  Exacerbating the risk, it is not uncommon for high, gusty winds associated with winter or summer storms to suddenly blow down many such hazardous trees at one time.

9.     Additionally, the dangers posed by fire-damaged hazard trees include not only the danger of falling trees, but also falling tops and limbs from trees that stay upright.  Broken tree tops and limbs can fall in any direction from a falling tree.  Falling limbs are a significant road maintenance problem in areas with high tree mortality.  Tops and limbs of all sizes can blow down long before the tree does.  The photos below, showing a hazard tree on the Bartlett sale both before and after its top broke off, illustrates this danger.

DECLARATION OF ANTHONY SABA  -  8





Figure 2.  Top photo was taken by Amanda Rogers, USFS, in late September of 2019 by USFS timber sale administrator in the Bartlett Roadside Hazard Tree project.  Bottom photo was taken by Amanda Rogers, USFS, after weather event with wind impacted the area on October, 2019. Broken top from Douglas-fir tree is now precariously high-up in canopy of neighboring tree closer to road.

DECLARATION OF ANTHONY SABA  -  9

10.     The marking guidelines used for this Project call for the removal of hazard trees within one-and-a-half tree height distance from the road, to account for trees rolling, movement after they fall, or to compensate for the force of a broken top's forward movement for trees falling towards the road.  The one and a half tree height recommendation is common for these types of efforts in that it compensates for the height of a tree falling towards infrastructure and then any additional distance from the force of a broken top or limbs that may proceed with forward movement from a falling tree.  The 200-feet from centerline boundary was established by estimating the average height of the hazard trees in the Project area, multiplied by one-and-a-half.  Road widths within the project area vary anywhere from 12' minimum up to 24' wide.  The Project's 200-foot boundary is from the center of the road, not the edge of the road.  This means that from the 200-foot boundary there is a 200-foot distance to the road center, but anywhere from 188-foot to 194-foot distance to the road edge.  The minimum tree heights that would need to be considered for removal if they hypothetically stood at the boundary itself would be 125 feet to 130 feet, since that would equate to the one and a half tree height designation direction.  Tree heights for the 14" DBH and greater designation within the Project areas may vary anywhere from approximately 65' to 200' in height, with average height being anywhere from 100' to 120' across the Project areas.

11.     When identifying hazard trees, trained field personnel make ocular estimates of tree heights.  With this information, the Forest designated the 200-foot road buffer with the expectation that not all hazards that are one-and-a-half tree heights away from the road will get treated because trees beyond the 200-foot boundary remain tall enough to reach our roads at one-and-a-half tree heights.  But in order to proceed with the urgent situation, the 200-foot buffer would capture the highest proportion of the hazards within the Project areas where treatment is effective to the most practical extent and would be accomplished in a timeframe that eliminates

DECLARATION OF ANTHONY SABA  -  10

the hazard as quickly as possible.  Requiring trained field personnel to precisely measure the height of each tree and its distance from the road is impractical for the amount of acres and miles of roads needing hazard tree treatment under these circumstances, and given the urgency of this work, ocular estimations are being made where some human error may occur, but not enough to have deleterious impacts.  If trees are not expeditiously treated, they may begin to fall onto the roadway, posing a severe risk to all road users.  The photo below, taken by Forest Service personnel, shows a hazard tree marked for removal in the Bartlett sale that fell across the road during the severe wind event  in October 2019, and is a grim reminder of the extreme hazards that persist in the burn area.



Figure 3.  Photo taken by Amanda Rogers, USFS, in October 2019.  Hazard tree designated for removal fallen across road.  These types of events cause risk to Forest users and employees in a post-fire environment and facilitate other stressors and resources needed by agency to ensure roads remain safe for ingress/egress.

12.     In the third allegation in the Voss email, Plaintiff claims that "the stumps from many of also the trees that have been felled indicate that these trees could never have fallen on

DECLARATION OF ANTHONY SABA  -  11

the road or rolled onto the road after falling." *See also* Second Voss Decl. ¶ 8 and Ex. 5, Figures 13, 14, 16, 17.  Despite Plaintiff's suggestion, it is impossible to determine which way a tree would have fallen simply by looking at the stump.  If the stumps encountered by Plaintiff are with the 200-foot boundary, the trees are presumed to have been dead or met the Fire-Injured Tree Marking and Hazard Tree Guidelines, were one and a half tree heights from the road, and were therefore removed.

13.    In response to the fourth allegation in the Voss email that "many trees that are marked for felling are completely green and have no evidence of potentially dying and being hazards now or in the future," the marking guidelines and logging process clearly refute Plaintiff's assertions.  *See also* Second Voss Decl. ¶ 6 and Ex. 3, Figures 5-9; Second Baker Decl. ¶ 8. Trees marked for removal were designated by trained field personnel utilizing the 2011 Marking Guidelines for Fire-Injured Trees in California and Hazard Tree Guidelines. Because the Fire-Injured Tree marking guidelines predict future mortality of fire-injured trees, some hazard trees marked for removal will retain green needles and still fall with the guidelines. Field verifications and spot checks have been incorporated throughout the implementation piece to ensure established guidelines were being properly utilized across the project areas.  Field visits were made to the Bartlett area before advertisement during the summer of 2019 and we observed that some bud break had occurred and added foliage to ponderosa pine trees within the Project area, but it not enough to warrant any significant concerns or changes to the existing removal designations.  Currently, timber sale administration team members make daily field to verify that trees marked for removal, despite having some green needles, still have characteristics that qualify them for removal.  Along with meeting the fire-injured tree marking guidelines, some of these conditions include, but are not limited to: insect infestation to live, weakened trees from the fire, severe cambium damage, basal or bole rot in areas that may facilitate tree failure, conks and

DECLARATION OF ANTHONY SABA  -  12

fungus indicative of heart-rot and unstable trees, cat faces, cankers, and other types of form and

phenotypic characteristics that lend themselves to failure and are identified as hazards within the

Hazard Tree Guidelines.   The photos below provide some examples of this.



Figure 4.  Photo taken in late September or early October by USFS timber sale administrator
Amanda Rogers.  There are pitch-tube and frass marks in between the furrows of the bark.  This
is indicative of successful bark beetle attack on tree.  Tree does have scorched foliage and live
foliage, though crown indicators are moot once Western bark beetles successfully attack the tree.
Live trees will succumb to successful bark beetle attack.

DECLARATION OF ANTHONY SABA  -  13



Figure 5.  Significant basal wound increasing tree vulnerability to insects and pathogens that exacerbate rot and compromise structural integrity. Also, an open wound like this allows moisture to penetrate the heartwood and increase rot and hence, hazard potential.  USFS photo from late September or early October of 2019.

DECLARATION OF ANTHONY SABA  -  14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Figure 6.  Tree correctly marked for removal showing a scar with exposed heartwood now
susceptible to various insects and pathogens that can compromise its structural integrity.  It also
is an area that may experience breakage when winds are high in the area.  Again, crown kill and
scorch criteria are moot when trees exhibit these types of characteristics.  Photo from late
September or early October of 2019 by USFS sale administration team.

DECLARATION OF ANTHONY SABA  -  15

14.     Very few trees previously designated for removal based on the crown scorch or kill proportions utilized for specific species and size classes of those respective species have responded vigorously enough since marking took place to now show a higher likelihood of survival, such that they could be retained as leave trees. Conversely, some trees that were not originally designated for removal in late winter of 2018 have since had additional die-back that could presently qualify them as hazard trees; however, some of these may be retained.  While the Forest Service recognizes that the marking guidelines cannot perfectly identify every tree that will live or die and that decisions on the ground have subjectivity even between highly trained field personnel, the guidelines still provide an excellent tool, and the best currently available scientific method we have, to predict tree failure and avoid compromising Forest user or employee safety.

15.     In the fifth allegation in the Voss email, Plaintiff adds that "many trees that have been felled are green, live trees without evidence of having any fire scorch (piles of unprocessed logs without scorch markings and green needles)."  See also Second Voss Decl. ¶ 5; Second Baker Decl. ¶ 8.  Based on the timber sale administrator's subsequent observations of the sale area, it is apparent that Plaintiff misinterpreted the log and slash piles shown in Plaintiff's photos at Second Voss Declaration, Exhibit 2, figures 1-4 to suggest that entire trees remained green, unscorched, and were not hazard trees.  To the contrary, when trees are cut during normal logging processes, their top boles and limbs are removed and the various pieces are piled or decked in separate piles.  The photos in Second Voss Declaration, Ex. 2, figures 1 and 2 are clearly slash piles of tops and limbs only, and do not represent the whole trees.  With respect to the photo in Second Voss Declaration, Ex. 2, figure 3, based on our examination of the photo and our timber sale administrator team's subsequent observations, the piles of unprocessed logs with green needles and no scorch markings that Plaintiff observed are in fact only the top boles and

DECLARATION OF ANTHONY SABA  -  16

limbs from larger trees that were removed according to the guidelines.  Many trees that meet the marking guidelines still retained green tops and upper limbs in this particular area; however, most of the bottom sections of the trees exhibited sufficient scorch to qualify them for removal. As explained above, some trees may have had other characteristics that qualified them for removal even though some of those trees at the landing do not have scorch on their boles.   Green tree tops in a landing are not an indication that the trees from which they came were not hazard trees. With respect to Second Voss Declaration, Ex. 2, figure 4, it is unclear from the photo the degree of scorch or the level of defect the trees may have represented. However, the sale administration team checks the bundles as they are brought in to the landings to make sure they are marked designated for removal.

16.      In the sixth allegation in the Voss email, Plaintiff challenges the marking of hazard trees along Forest Service road 15N07B, arguing that "trees are marked along a trail or a sub-level-a road is both closed to the public and cannot even be accessed by ORVs (15N07B), which should never have been consider for roadside hazard logging."  To the contrary, Road 15N07B is a Level 1 National Forest System road that accesses private property, and the private landowner has a key to the gate closing the road.  The primary purpose of the Ranch Fire Roadside Hazard Project is to reduce current and potential safety hazards along roads to create a safe transportation system for employees, contractors, firefighters, private landowners and the public—this includes private landowners that rely on Forest Service roads for access to their properties, including critical escape routes in the event of a wildfire.

17.      Plaintiff alleges in the seventh point in the Voss email that "there is substantial soil disturbance from skidding trees, creating bare soil, which is likely to erode in upcoming weather events."  See also Second Voss Decl. ¶ 8 and Ex. 5, Figures 13-18; Second Baker Declaration ¶ 11.  However, the photos Plaintiff provided at Second Voss Declaration, Ex. 5,

DECLARATION OF ANTHONY SABA  -  17

show normal soil and anticipated soil disturbance that is a necessary result of ongoing operations.  Cutting and skidding trees to designated landings creates bare mineral soil as trees are dragged across the ground.  These are standard operations with acceptable short-term effects.  Following timber removal operations in a given unit, they are appropriately treated if necessary to ensure that they are disconnected from any water source, and other soil stabilization measures are taken as needed for erosion control.  The operator in Bartlett has abided by all contract provisions with respect to the yarding of material, erosion control, and slash treatments.  To further minimize erosion, the Forest restricts ground-based skidding to slopes less than 35 percent.  Work can be reduced or shut down completely during rainy periods if erosion risks are deemed too great.  The timber sale contracts include special standards for logging operations during wet weather events to protect the roads, and adjacent resources.

18.    Next, Plaintiff alleges in the eighth allegation of the Voss email that "a large skid road near Pinnacle Rock was created and trees along that road were logged beyond the 200ft limit in the CE documentation."  See also Second Voss Decl. Ex. 5, Figures 13, 16 and 17.  All skid trail locations are agreed to by the contractor and the Forest Service timber sale administrator before any activities on skid trails take place. The skid trail referenced by Plaintiff was an existing a user-created trail which falls within the 200-foot cutting unit boundary of the adjacent system road, so some trees were removed in the vicinity.  According to the sale administration team, only two passes were made by the skidder on that user-created trail.  Impacts from the logging were minimal here compared to sustained public impact on the trail.  Based on the observations of our sale administrator, it appears that the stumps that Plaintiff may be referencing are in fact stumps of removed hazard trees within the 200-foot boundary of Forest Service road 16N01D, a system road that approaches the referenced user-created trail.

DECLARATION OF ANTHONY SABA  -  18

19.     In the ninth allegation in the Voss email, Plaintiff states that "there are trees marked for logging near Pinnacle Rock that, according to EPIC's Kimberly Baker, should have been unmarked (or markings blacked-out), but this has not been done."  Plaintiff appears to be referring to hazard trees that had been previously marked for removal within an archaeological site located in the existing harvest unit.  The marking was completed in late winter 2018-2019, prior to flagging of the archaeological site by a District archaeologist.  After marking had been completed, the Pinnacle Rock archaeological site boundaries were flagged for avoidance of mechanized activities.  The contractor is aware of these boundaries and of the flags, and understands that no trees will be removed from within the flagged area, regardless of the mark.  The locations of archaeological sites are confidential in order to protect the sites, and discussions about these locations take place with the contractor before operations begin, allowing them to recognize locations and correlate existing flaglines to these locations.  The marked trees referred to by Plaintiff will not be cut. The timber removal activities in this unit have already been completed.

20.     Finally, Plaintiff inexplicably claims in the tenth point in the Voss email that "most of the roads in the Bartlett sale area are open to the public and *have never been closed due to hazard issues*" (emphasis added). In fact, the July 11, 2019 memo referenced by Plaintiff and originally attached to the Voss email, the administrative record for Forest Order No. 08-19-03, had reopened the majority of the Ranch Fire area after it had been closed for almost a year.  The entire Ranch Fire area was first closed in Forest Order No. 08-18-13 on August 4, 2018, including Bartlett sale area.  That closure remained in effect until July 11, 2019, and was only lifted for the reasons stated in the Declaration of Ann Carlson filed with Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction.  The July 11, 2019, document and the Carlson Declaration made clear that hazards still remain in the burn area, including in areas that were

DECLARATION OF ANTHONY SABA  -  19

being reopened, and advised that signage would be posted to warn of the dangers present in the burn area.

21.    I have also reviewed each of the 95 photographs posted at the web link contained in the Voss email, which include the photographs contained as exhibits to the Second Voss Declaration.  The table attached hereto as Exhibit 1 contains my specific responses to these photos, and the photos that were subsequently included with the Second Voss Declaration are identified.  In sum, none of the photos in question lead me to believe that there is widespread misapplication of the tree marking guidelines or that trees are being inappropriately marked as hazard trees, as Plaintiff suggests.  My review of the photographs and the observations of the timber sale administration team confirm for me that the Fire-Injured Tree Marking Guidelines and the Hazard Tree Guidelines were both appropriately applied to ensure the safety of all road users in this area of the Ranch Fire Roadside Hazard Project.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this *1st* day of November, 2019, in *Willows*, California.

ANTHONY SABA
Forester/Silviculturist
Mendocino National Forest
United States Forest Service

DECLARATION OF ANTHONY SABA  -  20