JEAN E. WILLIAMS
Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

SALLY J. SULLIVAN (DC Bar No. 1021930)
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
4 Constitution Square
150 M Street NE
Washington, DC 20002
Tel: (202) 514-9269
Fax: (202) 305-0506
sally.sullivan@usdoj.gov

*Attorney for Defendants*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ENVIRONMENTAL PROTECTION INFORMATION CENTER,<br><br>Plaintiff,<br><br>v.<br><br>ANN CARLSON, in her official capacity as the Forest Supervisor of the Mendocino National Forest; and the UNITED STATES FOREST SERVICE,<br><br>Defendants. | Case No. 3:19-cv-6643-EMC<br><br>**DECLARATION OF ANN D. CARLSON IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER [ECF No. 18]** |

1  I, Ann D. Carlson, pursuant to Title 28, United States Code, Section 1746, declare as follows:

2.  1. I am the Forest Supervisor for the Mendocino National Forest (Forest), which includes portions of the Berryessa Snow Mountain National Monument (Monument).  Please refer to my declaration filed in Opposition to Plaintiff's Motion for Preliminary Injunction on November 1, 2019 for additional information about myself and my role as Forest Supervisor.  I make this declaration of my own personal knowledge and based on my discussion with my staff, and I could and would testify to the truth of the facts stated herein if called upon to do so.

2. I have reviewed Plaintiff's Motion for Temporary Restraining Order and supporting declarations, and I make this declaration in part to respond to certain allegations contained in the Second Declaration of Kimberly Baker.

3. As I stated in my earlier declaration, I authorized the Ranch Fire Roadside Hazard Tree Project, through a series of categorical exclusion authorizations, to address the serious safety concerns posed by the numerous hazardous trees left behind by the Ranch Fire, by removing roadside hazard trees with potential to strike the roadway, thereby restoring safe access to Forest road users.

4. The primary purpose of the Project is to reduce current and potential safety hazards along roads to create a safe transportation system for employees, contractors, firefighters, private landowners, and the public.  The hazard trees need to be removed; simply dropping the hazard trees and without removal, or with only relocation to decks and landings, would result in excessively high surface fuel loading along the roadways and greatly increase the risk and severity of another fire.  Moreover, as I described in my earlier declaration, it would be cost-prohibitive for the Forest to treat all of the hazards itself, as we lack the equipment and the crews to safely fall and relocate all of the identified trees.  For these reasons, the Project plans to remove hazard trees through a series of salvage sales.

5. In her Second Declaration, Ms. Baker contends that the Project "would greatly increase habitat fragmentation and may significantly harm the threatened and sensitive species,"

DECLARATION OF ANN D. CARLSON                                                                              2
CASE NO. 3:19-CV-6643-EMC

including the Northern spotted owl (NSO).  *See* Second Baker Decl. ¶ 10.  However, these claims are unfounded.  Prior to the Ranch Fire, the Project area contained approximately 4,500 acres of suitable NSO habitat, including nesting/roosting, foraging, and dispersal habitat.  Following the devastating effects of the fire, only approximately 3,000 acres of suitable habitat remained in the Project area.  It was the Ranch Fire that increased habitat fragmentation and caused significant harm to the NSO, not this important safety project that is occurring only in linear corridors adjacent to already disturbed National Forest system roads.  Forest Service specialists carefully examined the impacts of the Project on the NSO, including informally consulting with the U.S. Fish and Wildlife Service (USFWS) where necessary, and determined that there will be no effect on the NSO or its critical habitat in the Bartlett and Deer Valley areas, and may affect, but is not likely to adversely affect, the NSO or its critical habitat in the M3, M5, Felkner and M10 areas.  These determinations were reached based on the implementation of limited operating periods (LOPs) in portions of the Project area from February 1 to July 31, in order to restrict noise and smoke producing activities that could occur within 0.25 mile of surveyed nesting/roosting habitat during the NSO's breeding season.  Moreover, the Project retains large trees and downed wood within the project area, hazard tree removal activities do not downgrade any suitable or critical habitat remaining post-fire in those areas, and the Project retains green trees that would contribute to NSO habitat.  An LOP is also in effect in some parts of the project for Pallid and Townsends's big-eared bats from May 1 through August 15.

6. Due to the linear nature of the Project along roads and the abundance of dead trees outside the Project boundaries, removal of dead trees along roadways will not result in adverse impacts to NSOs seeking burned habitats for foraging.

7. Moreover, design features and best management practices are identified for all Project timber sales. These include LOPs that will be implemented on all timber sales in areas identified by Forest Service Wildlife Biologists. Design features are also identified for hydrology, erosion prevention and control, aquatic and streamside management zones, ground-

DECLARATION OF ANN D. CARLSON                                                                         3
CASE NO. 3:19-CV-6643-EMC

based skidding and yarding operations, water drafting, fisheries, geology, heritage resources, botany and invasive plants. Examples of additional design features identified for the Project include retaining at least 50% ground cover across all treatment areas and felling trees perpendicular to roads to minimize the skidding lengths, to ensure resources are protected throughout implementation.  These features are included in the NEPA Compliance Checklist for each project.

8. The Operator and Sale Administrator work together to ensure design features and best management practices are implemented as identified by the Forest Service resource specialists.  With the implementation of these design features, the Project will not "adversely affect[] threatened species, water quality and [] increase the spread of invasive plants," as Ms. Baker suggests.  *See* Second Baker Decl. ¶¶ 7, 11.  To the contrary, the design features and best management practices are implemented to specifically avoid the impacts Ms. Baker complains of.

9. Ms. Baker also expressed concern about the removal of allegedly live trees in Late Successional Reserves (LSRs), NSO Activity Centers, and NSO Critical Habitat.  *See* Second Baker Decl. ¶ 9.  However, many areas that once had late successional characteristics before the fire are no longer considered suitable for NSO nesting/roosting due to changes from the fire. For example, on the Bartlett timber sale there are two 100 acre Late Successional Reserves (LSRs) that fall within the Bartlett project boundary.  After field visits with USFWS it was determined that the two 100 acre LSRs had almost 100% tree mortality.  Therefore there is no longer any viable nesting/roosting NSO habitat within these LSRs to preserve.

10. There are also three NSO Activity Centers associated with these LSRs.  Based on the fact that post-fire there is no longer any viable nesting/roosting NSO habitat left within the LSRs or within or adjacent to the Activity Centers, USFWS has determined that the Activity Centers have been abandoned due to loss of habitat.  There is no designated Critical Habitat within the Bartlett project area.

DECLARATION OF ANN D. CARLSON                                                                 4
CASE NO. 3:19-CV-6643-EMC

**Harm to the Forest Service and the Public Due to Delay From a Temporary Restraining Order**

11. As I stated in my earlier declaration, because of the LOPs and rainy season limitations, the optimal hazard tree removal season is August through November. With the onset of winter, timber operations and use of roads is weather-dependent. In December snow is likely in the M5/Pacific area. Snow could mean the shut-down of hazard tree removal operations until spring. Equipment sitting idle is not good for anyone, especially a purchaser. The expense of moving equipment is so high that it is unlikely that the purchaser would come back because of the extensive deterioration of the wood, and they could possibly be released from their contract to cut their losses as a result. Therefore, if a TRO were granted and hazard tree removal operations were to remain shut down until the Court rules on Plaintiff's Motion for Preliminary Injunction in late December, the delay in implementation until December would result in significant harm to the Forest, private landowners and all Forest visitors, as well as jobs and revenue losses to the timber sale contractors. With winter season making operations difficult to impossible after December, and with the LOPs beginning in February, operations may not realistically be able to resume until August of 2020.

12. Ceasing removal of hazard tress along roadways within the Ranch fire area will leave trees that might fall onto the roadway and injure or kill people. This is a very serious risk that the Forest needs to mitigate as quickly and efficiently as possible. As the Declaration of Tony Saba filed herewith illustrated, a hazard tree designated for removal fell across the road on October 27, 2019 during a strong wind event.

13. Moreover, as I also described in my earlier declaration, closing the Forest roads to minimize risks to users is not practical because Forest management needs to occur, private landowners need to access their land, and hunters and Forest visitors want access to their public lands.

14. Now is the time to remove the dead and dying trees. If we wait even two weeks to treat the hazards, the trees will continue to deteriorate and lose whatever value they currently

DECLARATION OF ANN D. CARLSON                                                                                         5
CASE NO. 3:19-CV-6643-EMC

have to the logging industry who has the equipment and is willing to purchase and remove them from the roadways. Timber deterioration with the Project area is being exacerbated by an increase in insects and disease that feed on and break down the trees killed or injured by fire. As time passes, the Forest is constantly having to adjust downward the estimates made just months ago due to this ongoing rapid loss of volume.

15. The Forest Service simply does not have the capacity to drop and remove all the dead and dying trees along these important access roads on the Forest; we need the assistance of professional timber sale contractors.

16. Timber receipts for roadside hazard tree removal thus far are approximately $83,000. If the Forest Service does not utilize industry to help with the hazard tree removal effort it would cost approximately $1,400,000 to abate the risks in the Bartlett and M5/Pacific Project areas alone.

17. Bartlett operations are ongoing and we anticipate up to 8 weeks of work remaining on the sale. The purchaser currently has felled logs still on the ground. If they are shut down, they will lose the investment in time and money they made to fall the timber, and if the wood is left on the ground for a prolonged period of time, it will break down at a rapid rate and may not be suitable to be shipped to the mill. The purchaser would ultimately lose the cost of felling the timber because they could not redeem the value of the product. The purchaser of M5/Pacific has moved their equipment onto the sale area and has requested to start cutting and removing the dead and dying trees on Monday November 4, 2019. If they were to be shut down next week, they would be harmed by the additional move out and potentially move back in costs that they would incur.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of November, 2019, in Willows, California.

DECLARATION OF ANN D. CARLSON
CASE NO. 3:19-CV-6643-EMC

6

                                  */s/ Ann D. Carlson*

ANN D. CARLSON
Forest Supervisor
Mendocino National Forest
United States Forest Service

DECLARATION OF ANN D. CARLSON          7
CASE NO. 3:19-CV-6643-EMC