JEAN E. WILLIAMS
Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

SALLY J. SULLIVAN (DC Bar No. 1021930)
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
4 Constitution Square
150 M Street NE
Washington, DC 20002
Tel: (202) 514-9269
Fax: (202) 305-0506
sally.sullivan@usdoj.gov

*Attorney for Defendants*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ENVIRONMENTAL PROTECTION INFORMATION CENTER, <br><br> Plaintiff, <br><br> v. <br><br> ANN CARLSON, in her official capacity as the Forest Supervisor of the Mendocino National Forest; and the UNITED STATES FOREST SERVICE, <br><br> Defendants. | Case No. 3:19-cv-6643-EMC <br><br> **DECLARATION OF ANN D. CARLSON IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

I, Ann D. Carlson, pursuant to Title 28, United States Code, Section 1746, declare as follows:

1. I am the Forest Supervisor for the Mendocino National Forest (Forest), which includes portions of the Berryessa Snow Mountain National Monument (Monument). The Mendocino National Forest is comprised of 913,306 acres of National Forest System (NFS) lands in the northern region of California, 197,000 acres of those comprise the Monument. I have been Forest Supervisor for the Forest since April 6, 2015, with the exception of a four-month period in 2018 when I served a temporary detail as Forest Supervisor on the Sequoia National Forest. I make this declaration of my own personal knowledge and I could and would testify to the truth of the facts stated herein if called upon to do so.

2. I have worked for the Forest Service since 1989. Prior to serving as the Forest Supervisor for the Mendocino National Forest, I was the Eagle Lake District Ranger on the Lassen National Forest, Susanville, California, from January 2011 to April 2015. During this time, I also completed a temporary assignment as Forest Supervisor on the Modoc National Forest, in Alturas, California. Prior to my tenure on the Lassen National Forest, I was the Northern Regional Aquatic Ecologist in Missoula, Montana, from 2003 through 2010. While working in the Northern Region, I served temporary assignments as a District Ranger on the Buffalo Gap National Grasslands on the Nebraska National Forests and Grasslands in Wall, South Dakota and as Deputy Forest Supervisor on the Boise National Forest in Idaho. I began my Forest Service career as a fish biologist in 1989 on the Tahoe National Forest, where I remained as the Forest Fisheries Program Manager until 2003.

3. I have a Bachelor of Science degree in Aquatic Ecosystems Assessment and Management from Western Washington University and a Master's of Science degree in Aquatic Ecology from Utah State University.

4. As the Forest Supervisor, I am responsible for the stewardship and management of the Forest and Forest Service-managed portions of the Monument including, but not limited to, personnel and resources, recreation, range, vegetation, wildlife, cultural resources, fire and

fuels management, aquatic resources, special uses, and protecting the objects of scientific and historic interest for which the Monument was established.  These responsibilities include assuring compliance with the Forest Land and Resource Management Plan, the July 10, 2015 Presidential Proclamation Establishing the Monument, the National Environmental Policy Act (NEPA), Endangered Species Act, Clean Water Act, and all policies and laws pertaining to the management of the National Forest and Monument.

**The Ranch Fire**

5. On July 27, 2018, the Ranch Fire ignited on private land in Potter Valley, adjacent to the Upper Lake Ranger District of the Forest in Mendocino County, from a spark caused by a rancher driving a stake in waist-high grass.  The fire burned for almost two months before it was finally contained on September 18, 2018. To date, the Ranch Fire is the largest recorded fire in California's history at 410,203 acres, with approximately 288,000 acres burned on Forest land.  *See* Exhibit 1 attached hereto (photo providing a landscape scale view of the destruction caused by the Ranch Fire in the area of the Forest above Clear Lake).  The Ranch Fire affected, to varying degrees, approximately 770 miles of National Forest System roads on the Forest.  Following the fire, the Forest identified approximately 180 miles of roads used by the public, Forest Service personnel, Forest Service contractors, private landowners, and public safety providers, including firefighters, along which trees killed or damaged by the fire were most at risk of falling into the roadway, posing a safety and access risk to all road users.

6. Several area and road closures have been issued in the Forest because of the hazardous tree situation resulting from the Ranch Fire.  The initial area closure, which went into effect during the fire, was put in place to protect public and employee safety and remained in effect through the winter of 2018 and into 2019.  However, a need remained to provide access for special use permit holders, such as grazing permittees and recreational residences, private property owners, contractors, and workers maintaining communication sites on NFS lands.  In addition, Forest Law Enforcement and Forest Protection Officer personnel found it very difficult to enforce the closure. The public was continuing to access the closure area by driving on roads

DECLARATION OF ANN D. CARLSON                                                                                              3
CASE NO. 3:19-CV-6643-EMC

that did not have gates, relying on friends or acquaintances that had keys to the gated roads, and leaving gates open so anyone could use the road. Unlike national parks, national forests do not have gated and controlled access points, and therefore instituting and enforcing extended large area closures can prove extremely challenging logistically.

7. Confronted with these difficulties, in the summer of 2019 I decided to take a different approach to protecting the public from hazards in the burned area while we continued to plan the hazard tree removal projects. Rather than maintaining the road closures, we reopened most of the affected roads, but continued to provide for public safety by providing information through large visible signs posted at major entry points warning of the dangers, publishing news releases warning of the same, and engaging in direct personal contacts with forest visitors. *See* Exhibit 2 attached hereto (photo showing one of the signs posted at an entry point of the Forest warning of the dangers associated with entering a burned area). However, as we are now entering the second winter after the fire, the risk of damaged, rotting, fire-killed trees falling on roadways during the winter months will be significantly increased due to the potential for erosion, landslides and debris flows during the rainy season. While most roads in the fire area are currently open, campgrounds, trailheads, and off-highway vehicle use areas remain closed because of the heightened risks associated with people parking vehicles or recreating under the dead and dying trees. *See* Exhibit 3 attached hereto (photo showing a fallen hazard tree in the Lower Nye Campground in the Upper Lake Ranger District). Because the hazards to road users persist, it is imperative that we treat the hazard trees expeditiously to ensure the safety of Forest personnel, visitors, private landowners, contractors, and firefighters.

**The Ranch Fire Roadside Hazard Tree Project**

8. In order to address the serious safety concerns posed by the numerous hazardous trees left behind by the Ranch Fire, I authorized the Ranch Fire Roadside Hazard Tree Project (Project) to remove roadside hazard trees with potential to strike the roadway, restoring safe access to Forest road users. Forest Service resource specialists initially analyzed an estimated

7,000 acres for roadside tree abatement. The Project, through a series of authorizations described below, proposes to remove hazard trees on approximately 4,700 of those acres.

9. The primary purpose of the Project is to reduce current and potential safety hazards along roads to create a safe transportation system for employees, contractors, firefighters, private landowners, and the public. Because of the nature of the fire, there are currently far too many hazardous trees along the roadways to simply drop and leave them on the ground. Dropping all hazard trees without removal would result in excessively high surface fuel loading along the roadways and greatly increase the risk and severity of another fire. For that reason, the Project plans to remove hazard trees through a series of salvage sales.

10. To date, in furtherance of the Project, I have authorized four Categorical Exclusions (CEs) to address safety hazards along roadways contained within the Ranch Fire burn area. The applicable category of actions is identified in agency procedures as *Repair and maintenance of roads, trails, and landline boundaries*, 36 C.F.R. § 220.6(d)(4). Road maintenance, as described in the Forest Service Handbook, includes providing safe road access in the Forest. Authorizations I have issued to date include:

- Bartlett Roadside Hazard Tree Maintenance Project, USDA Forest Service Mendocino National Forest, Berryessa Snow Mountain National Monument, Upper Lake Ranger District, Lake County (originally signed 5/21/2019, corrected final 9/5/2019).

- Grindstone Ranger District Roadside Hazard Tree Management Project M3, Felkner and M5. USDA Forest Service Mendocino National Forest, Berryessa Snow Mountain National Monument, Grindstone Ranger District, Glenn & Colusa Counties (originally signed 7/8/2019, corrected final 9/13/2019).

- Grindstone Ranger District Roadside Hazard Tree Management Project M10. USDA Forest Service Mendocino National Forest, Grindstone Ranger District, Glenn & Colusa Counties (signed 7/8/2019).

- Deer Valley Roadside Hazard Tree Maintenance Project, USDA Forest Service Mendocino National Forest, Berryessa Snow Mountain National Monument, Upper Lake Ranger District, Lake County (signed 9/9/2019).

11. A fifth authorization, for Pine Mountain, is currently under development for the Upper Lake Ranger District areas of the Forest and Monument. While some of the analysis for Pine Mountain was included with the analysis for Deer Valley (under the title "Pine Horse Valley"), no decision or authorization has yet been issued for Pine Mountain.

12. The status of the currently offered and authorized salvage sales, under the authorizations described in ¶ 10, is provided in the table attached hereto as Exhibit 4.

13. Roadside hazard treatments involve removing only trees that constitute hazards to the selected roads according to the Marking Guidelines for Fire-Injured Trees in California (Smith and Cluck 2011) and the Hazard Tree Guidelines for Forest Service Facilities and Roads in the Pacific Southwest Region (Angwin et al. 2012), and that have the potential to reach roadways. Based on the cruise data for the Project, the vast majority of the hazard trees to be removed are dead, as determined by trained Forest Service personnel and according to the Forest Service's Fire-Injured Tree Marking Guidelines and Hazard Tree Guidelines. Trees that are fire-injured but not yet dead will only be removed if they qualify for removal under the Guidelines.

14. In addition to removing hazard trees with merchantable timber volume, the Project includes non-commercial hazard tree abatement work along the roads to protect road users and help create defensible space from which firefighters can suppress future wildfires approaching the area. Under current conditions and without treatment, it would not be safe for firefighters to use these roads to access new fires on the landscape because of the significant risk associated with falling hazard trees.

15. The Project will treat a narrow, linear corridor situated specifically around preexisting roads (extending 200 feet from the centerline of the road), which already experienced habitat alteration and disturbance from road construction, maintenance, and

DECLARATION OF ANN D. CARLSON                                                                 6
CASE NO. 3:19-CV-6643-EMC

ongoing use. These road corridors contribute to a network of protective fuel-breaks and areas for prescribed fire across the landscape. Roadside fuels reduction treatments will help maintain safe ingress and egress for suppression efforts and, similar to Fuels Management Zones, provide pre-treated areas for future prescribed fire implementation. Roadside fuels reduction treatment will also enhance the effectiveness of the fuel breaks, contribute to reduced fire intensity along treated roads that are used for control lines, and increase the probability of successful fire suppression operations in the future.

16. Trees not deemed hazardous will be retained. Although long stretches of road are identified for treatment, not all of these corridors contain dead/dying hazardous trees, therefore, these areas would remain untreated. In low intensity areas only a small number of hazardous trees would likely require removal, and more forest structure would remain. In areas of higher burn intensity, more trees would require removal. However, under the project design features applicable to each authorization, diverse structure would still be left across the landscape for wildlife species, including the Northern Spotted Owl (NSO).

17. Prior to the Ranch Fire, the Project area contained approximately 4,500 acres of suitable NSO habitat, including nesting/roosting, foraging, and dispersal habitat. Following the devastating effects of the fire, only approximately 3,000 acres of suitable habitat remained in the Project area. Project specialists determined that there will be no effect on the NSO or its critical habitat in the Bartlett and Deer Valley areas, and may affect, but is not likely to adversely affect, the NSO or its critical habitat in the M3, M5, Felkner and M10 areas. These determinations were reached based on the implementation of limited operating periods (LOPs) in portions of the Project area from February 1 to July 31, in order to restrict noise and smoke producing activities that could occur within 0.25 mile of surveyed nesting/roosting habitat during the NSO's breeding season. Moreover, the Project retains large trees and downed wood within the project area, hazard tree removal activities do not downgrade any suitable or critical habitat remaining post-fire in those areas, and retains green trees that would contribute to NSO

habitat. An LOP is also in effect in some parts of the project for Pallid and Townsends's big-eared bats from May 1 through August 15.

18. The Project also includes design features, such as retaining at least 50% ground cover across all treatment areas, felling trees perpendicular to roads to minimize the skidding lengths, and imposing limited operating periods for wildlife, to ensure resources are protected throughout implementation. These features are included in the NEPA Compliance Checklist for each project.

19. In addition to LOPs, work will be decreased and could be shut down completely during the rainy season, and timber contracts include standards for logging operations during wet weather events to protect the road and adjacent resources. With LOPs and wet season limitations, the optimal hazard tree removal season is August through November.

20. The Ranch Fire burned through 155,000 acres on the Forest portion of the Berryessa Snow Mountain National Monument. Resource specialists reviewed the activities proposed under the Project and determined that there would be only negligible impacts to the scientific and historic objects of interest within the Monument from the Project. Their assessments are included in the project-specific Monument Interdisciplinary Team analysis checklists.

**Public Interests Served by the Project**

21. The Project is located within the southern one-third of the Forest in Lake, Glenn and Colusa counties. The removal of fire-killed or weakened hazardous trees along roads is necessary to provide for safe passage for Forest workers, contractors, firefighters, and the public. These hazard trees could fall on roadways blocking access, or cars or people using those roadways, resulting in death or serious injury.

22. Removing hazard trees from important recreation areas, like Letts Lake, before the onset of the 2020 recreation season will also allow these areas to reopen to the public, helping to minimize the additional economic impacts on the Forest and the small local communities that surround the Forest and are dependent on forest visitors. Letts Lake is one of

the most visited recreation areas on the Forest. *See* Exhibit 5 attached hereto (photo showing the destruction caused by the Ranch Fire in the Letts Lake area). The Forest has already lost approximately $27,000 in campground fee-generated revenue at Letts Lake alone during the time the area has been closed due to hazard trees. The Forest has also experienced significant revenue loss from the cancellation of major special use events in other closed recreation areas which would generate campground fees. These events also support the local economy through the sale of camping and other supplies to participants en route to the Forest; the revenue losses from the closures and event cancellations have therefore been felt well beyond the Forest boundaries.

23. In addition to the invaluable benefits of public safety and access to the National Forest, the Project also benefits the local communities surrounding the Forest in the form of timber revenues and logging and milling jobs. The hazard tree removal operations are estimated to create approximately 17 full-time logging jobs at a value of $1,393,200, and the logs removed would themselves employ a medium size sawmill (of approximately 200 people) for four months processing the trees.

**Harm from delay**

24. With each passing day following a fire, the merchantable wood in a fire-killed tree declines in both volume and value (in other words, in both quantity and quality). In the western United States, the majority of timber volume and value decline generally occurs within the first two years following a fire, although actual rates of deterioration depend on many factors. As timber volume and value decline, at both the individual tree and forest-stand scales, the ability to leverage the commercial value of these dead and dying trees to pay for their removal and for hazardous fuel reduction actions becomes increasingly less likely.

25. In this case, timber deterioration within the identified project areas is also being exacerbated by an increase in insects and disease that feed on and break down the trees killed or injured by fire. *See* Exhibit 6 attached hereto (photo showing additional damaged caused insect activity on an already burned tree in the Project area). As the Forest packages the timber sales,

DECLARATION OF ANN D. CARLSON                                                                     9
CASE NO. 3:19-CV-6643-EMC

the estimated volume of each offering is having to be adjusted from estimates made just months ago due to this ongoing rapid loss of volume.

26. For example, the Bartlett sale was the first of the Project's salvage sales to be offered and awarded by the Forest. However, the original volume was reduced nearly 50% (from 3.5 million board feet (MMBF) to 1.7 MMBF)) from original estimates due to the high presence of ponderosa pine within the area that deteriorated rapidly. The volume for the second salvage sale to be awarded, M5 Pacific, was decreased by nearly 60% from original estimates, also due to the high deterioration of pine within this sale. Significant timber deterioration has already occurred and will continue to get worse if Project implementation is delayed, therefore making the successful sale of the timber, and with it the efficient mitigation of hazard trees, less likely.

27. A delay in the implementation of this project would likely prevent the roadside hazard trees from being felled this season. If the deterioration renders the timber unmerchantable by next year, this delay would also likely mean that at least some of the very hazardous work of hazard tree felling will have to be completed by hand by Forest Service fire crews as time and availability permit, whereas the timber sale contractor, if allowed to proceed, has the necessary equipment and machinery to far more safely and efficiently complete the work.

28. Plaintiff's proposed carve out—which would allow the Forest Service to fell trees "causing an immediate risk to roadways"—is not a suitable solution. Identifying such trees would be impracticable because of the often unpredictable nature of assessing hazard trees. For example, some trees may look fairly solid from the ground up, but close investigation may show holes in the soil where the roots have burned out. In that situation, what little is left of the tree roots could deteriorate quickly over the winter in wet soils. As a result, the following season, the tree could be very unstable and the likelihood of it falling increases daily. While there are normally visual signs evident on a live hazard tree that indicate rot or disease that weaken the structure of a tree, these signs, such as conks, are often destroyed by fire so there are

DECLARATION OF ANN D. CARLSON                                                                                       10
CASE NO. 3:19-CV-6643-EMC

often few if any indicators left to assess the degree of internal rot, making identification of the most imminent hazards difficult if not impossible.  Moreover, major weather events which include high, gusty winds, such as those associated with winter storms, could result in a sudden blow down of many hazardous trees at one time, posing an unacceptable risk to Forest workers and visitors alike.   For these reasons, the Forest considers all of the hazard trees identified for removal under the identified guidelines to pose a risk to the roadways that threatens the safety of the public, employees, firefighters, private landowners, and contractors, and it is therefore important to remove all of these hazardous trees in a timely, efficient, and cost-effective manner so that safe access to areas can be restored.

29.     Left untreated, many burned areas within the Project will also be at a heightened risk for future high severity fire as fire-killed trees fall and become surface fuels.  And the deteriorating and unstable conditions could pose significant risks for firefighters and impede their efforts to fight future blazes.  These snags and down trees may impede public access and pose a threat to the safety of the public, firefighters and other workers for years to come.

30.     Consistent with the goals of the Forest Land and Resource Management Plan, the Project also provides the benefit of setting the stage for restoration of the forest following the devastating effects of the Ranch Fire.  If Project implementation is delayed, the progressive timber deterioration would result in fewer dead trees and hazardous fuels being removed, which could, in turn, may make some future planned forest restoration work impossible, since actions taken by the timber sale contractor set the stage for reforestation activities by first removing standing dead trees and removing heavy fuels to create a safer work environment during future projects.  Thus, in addition to reducing the risks associated with falling hazard trees, the Project also addresses the safety risks to employees and contractors associated with implementing future restoration projects in the Forest.

31.     Because of the rapid wood deterioration noted above, it is imperative to continue implementing the Project to maximize the amount of work that can be achieved this year before too much further deterioration of fire-killed trees occurs.  The fewer fire-killed trees that can be

DECLARATION OF ANN D. CARLSON                                                                                                 11
CASE NO. 3:19-CV-6643-EMC

commercially removed from the project area, the less likely it is that the human-safety, ecological, and socio-economic goals of the Project will be met.

32. If an extended project delay leaves the Forest unable to accomplish the hazard tree removal work through timber sales, the Forest would have to consider the cost of doing work without timber sales. Such delay would force the Forest to seek appropriated funding to accomplish the Project's objectives. The projected costs to accomplish project activities through service contracts are very substantial. Funds for fuels reduction work are typically very limited and must be appropriated by Congress, and are never guaranteed. For example, the Bartlett sale was awarded to a timber sale contractor for $35,000 in revenue to the Forest Service. The Forest estimates that completion of the hazard tree and fuels reduction work would cost the Forest approximately $500,000 in service contracts on the Bartlett sale area alone if the project were delayed and the trees could not be sold. Overall, the Forest anticipates that it would cost the Forest Service approximately $5.5 million to remove the roadside hazard trees and effectively treat the fuels generated from this effort across the Project area if timber contracts were no longer available. It is highly unlikely that the Forest Service could obtain sufficient appropriated funds to accomplish all project activities.

33. As discussed above, delay in the removal of dead trees often equates to not being able to implement a project due to lost value and economics. If the project is allowed to proceed, the current value of the dead merchantable trees is still expected to cover the cost of hazard tree removal. However, in another six months to a year this will likely no longer be true, and the Forest will likely not be able to afford the costs of removal.

34. The effects of not treating the roadside areas include ever-increasing threats to public safety, which could ultimately result in long-term road and recreation area closures at great detriment to the public; and an over-accumulation of highly flammable forest material, eventually increasing the potential for future severe wildfires.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31st day of October, 2019, in Willows, California.

*[signature]*

ANN D. CARLSON
Forest Supervisor
Mendocino National Forest
United States Forest Service

DECLARATION OF ANN D. CARLSON  13
CASE NO. 3:19-CV-6643-EMC