UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENVIRONMENTAL PROTECTION INFORMATION CENTER,<br><br>Plaintiff,<br><br>v.<br><br>ANN CARLSON, et al.,<br><br>Defendants. | Case No. 19-cv-06643-EMC<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Docket No. 11 |

## I.    <u>INTRODUCTION</u>

The United States Forest Service approved six logging projects to mitigate the safety hazards affecting the roads in Mendocino National Forest. These projects will allow commercial logging of nearly 7,000 acres of trees that are dead, dying, and/or live trees that are rapidly deteriorating such that they pose a risk of falling onto the public roadway. The operations of two projects have already begun.

Plaintiff Environmental Protection Information Center ("EPIC") moves the Court for a preliminary injunction "to preserve the status quo pending resolution of the case, allow[] only the felling of hazard trees which are imminently likely to fall into a roadway [or] other developed area, prohibit tree felling along Level 1 roads and OHV trails, and prohibit the sale and removal of any felled trees in order to avoid irreparable harm to Plaintiff." Docket No. 11 ("Mot.") at 1.

In an earlier ruling, this Court partially granted EPIC's motion for a temporary restraining order:

> The Government may not authorize any operations as to the M10 West project until the resolution of Plaintiff's preliminary injunction motion. Such restraint will not prejudice the Government, as it

> represented the project has not yet begun, and would not begin until, as government counsel estimated, a week after a contractor wins the bid. However, the Government may continue to advertise and/or sell the M10 West project (*e.g.*, continue the bidding process, finalize the contract award, etc.), so long as it informs bidders that any awarded contract is subject to an injunction. Plaintiff's remaining relief for a TRO is **DENIED**. The Bartlett and M5 Pacific projects may continue.

Docket No. 42. Based on a review of the administrative record, the briefs filed herein pertaining to the instant motion as well as the motion for a temporary restraining order (including the amicus), and oral argument of the parties, the preliminary injunction motion is **DENIED**.

## II. BACKGROUND

A. Factual Background

In July 2018, the Ranch Fire burned nearly 300,000 acres in Mendocino county. Docket No. 1 ("Compl.") ¶ 16. In response, the Forest Service announced six projects to "remove 'merchantable' trees within 200 feet on both sides of selected roads and within 100 feet of the roads that run adjacent to the Snow Mountain Wilderness." *Id*. ¶ 19. The projects are titled as the M1, M3, M5, M10, Bartlett, and Felkner Projects (collectively, the "Projects"). *Id*. ¶ 22.

The complaint alleges the location of these Projects "are draped by mixed conifer forest, oak woodlands, and are interspersed by recovering burned, logged, and un-forested areas, including chaparral. The conifer forests and oak woodlands, where logging is proposed, provide essential wildlife habitat, hiding cover, and core habitat for old forest-dependent wildlife, including the threatened Northern spotted owl." *Id*. ¶ 17. According to Plaintiff, the Ranch Fire "created new forest habitat types, including complex early seral forest habitat, also known as 'snag forest' habitat, which, if left unlogged, serves as important habitat for small mammals and birds. Predators, including Northern spotted owls, seek out these burned areas due to their abundance of small mammal prey species." *Id*. ¶ 18.

In June 2019, the Forest Service began accepting bids for the Bartlett Project, which pertained to the sale of 1.7 million board feet of timber. *Id*. ¶ 28. Bidding ended the following month. *Id*. The Forest Service awarded the Bartlett Project in August 2019. In August 2019, the Forest Service began accepting bids for the M5 Pacific Ridge Project, which involved 6.5 million board feet of timber. *Id*. ¶ 31. By October 2019, the Forest Service awarded the M5 Pacific Ridge

1  Project. *Id*. ¶ 34.

2  The Forest Service did not conduct an environmental review under the National Environmental Quality Act ("NEPA") for any of the Projects. Instead, it relied on the categorical exclusion under 36 C.F.R. § 220.6(d)(4), which applies to "[r]epair and maintenance of roads, trails, and landline boundaries."

As of November 21, 2019, operations for the Bartlett and M5 Pacific Ridge Projects were underway with five and seven weeks of operations remaining until completion, respectively. The Forest Service finalized bidding for the M10 West Project. The Court extended its TRO of the M10 West Project's operations to December 2, 2019. The Court determined that the TRO would have little to no prejudice to the Forest Service because finalization of the M10 West contract will take at least one or two weeks before operations can begin. The remaining projects have not entered their bidding phases.

In its motion for a preliminary injunction, EPIC does not argue for a blanket ban on logging. Instead, it takes the position that the Forest Service must comply with NEPA by conducting an environmental review before approving and permitting the Projects to go forward. Nor does EPIC object to the felling of trees at risk of falling. It argues only truly at-risk trees should be felled, and that once felled they should remain on the forest ground in their natural habitat and not removed by loggers for harvesting.

B.  Procedural Background

EPIC filed its lawsuit on October 16, 2019. *See* Compl. The complaint alleges one claim for relief: NEPA violation. *Id*. ¶ 63–67. EPIC concurrently filed this motion, noticed for November 14, 2019, but not in compliance with this Court's 35-day rule for noticing motions. The Court reset the hearing to December 19, 2019. Thereafter, EPIC moved for a temporary restraining order to enjoin all logging pending the resolution of the preliminary injunction motion. Docket No. 18. The Court then advanced the TRO hearing to November 21, 2019. Docket No. 42. Sierra Pacific Industries ("SPI"), the contractor of the M5 Pacific Project, filed a motion to intervene as of right under FRCP 24(a) or, in the alternative, permissive intervention pursuant to Rule 24(b). The Court denied SPI's Rule 24 motion, but permitted it leave to file an amicus brief.

3

*Id.*

As noted above, on November 5, 2019, the Court issued a TRO and set the hearing on the preliminary injunction for November 21, 2019.

### III. LEGAL STANDARD

A party seeking a preliminary injunction must meet one of two variants of the same standard. Under the original *Winter* standard, a party must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). Under the "sliding scale" variant of the *Winter* standard, "if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)).

### IV. DISCUSSION

A. Likelihood of Success on the Merits

EPIC argues it is likely to succeed on the merits because the Forest Service violated federal law by circumventing the requirement to conduct an environmental review prior to commencement of its Projects. Mot. at 8–9. Here, for purposes of determining the likelihood of success on the merits, "[t]he issue before the court is not whether the dead trees should be cut, but only whether the Forest Service violated federal law in choosing not to perform an environmental assessment before deciding to cut them." *Forest Conservation Council v. U.S. Forest Serv.*, No. CV-03-0054-PCT-FJM, 2003 WL 23281957, at *2 (D. Ariz. July 9, 2003), *aff'd*, 110 F. App'x 26 (9th Cir. 2004).

NEPA requires that federal agencies prepare "a detailed statement by the responsible official on . . . the environmental impact" of any federal actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008). NEPA's purpose is twofold:

4

(1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *Ctr. for Biological Diversity*, 538 F.3d at 1185. "NEPA is a procedural statute," designed to ensure "that federal agencies take a 'hard look' at the environmental consequences of their proposed actions before deciding to proceed." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012) (quoting *Methow Valley*, 490 U.S. at 350–51).

According to EPIC, pursuant to NEPA and the Forest Service's own regulations, the Forest Service must submit an Environmental Assessment ("EA") or Environmental Impact Statement ("EIS") before it can approve commercial logging of more than 250 acres. The Forest Service did not comply with this requirement relying on a categorical exclusion for road maintenance, which has no acreage limitation. Docket No. 29 ("Opp.") at 10. The relevant categorical exclusion upon which the Forest Service relied is denoted as Categorical Exclusion (d)(4) ("CE-4"). CE-4 excludes from the requirement of an EA or EIS:

> Repair and maintenance of roads, trails, and landline boundaries. Examples include but are not limited to: (i) Authorizing a user to grade, resurface, and clean the culverts of an established NFS road; (ii) Grading a road and clearing the roadside of brush without the use of herbicides; (iii) Resurfacing a road to its original condition; (iv) Pruning vegetation and cleaning culverts along a trail and grooming the surface of the trail; and (v) Surveying, painting, and posting landline boundaries. 36 C.F.R. § 220.6(d)(4).

EPIC argues that CE-4 was not a proper basis for the Forest Service's action here. Instead, EPIC contends the applicable exclusion is CE (e)(13) ("CE-13"). CE-13 excludes

> Salvage of dead and/or dying trees not to exceed 250 acres, requiring no more than ½ mile of temporary road construction. The proposed action may include incidental removal of live or dead trees for landings, skid trails, and road clearing. Examples include, but are not limited to: (i) Harvest of a portion of a stand damaged by a wind or ice event and construction of a short temporary road to access the damaged trees, and (ii) Harvest of fire-damaged trees. 36 C.F.R. § 220.6(e)(13).

Importantly, CE-13 contains an acreage limitation, whereas CE-4 does not.

There is an additional procedural distinction between subdivisions (d) and (e) of the

5

categorical exclusions. Those that fall under subdivision (d) are not required to submit a Decision Memo, whereas exclusions under subdivision (e) must file a Decision Memo. *Compare* 36 C.F.R. § 220.6(d), *with* § 220.6(e). Where a Decision Memo is required, the responsible official must notify interested or affected parties of the Decision Memo, which must include, among other things, the "[d]ecision to be implemented and the reasons for categorically excluding the proposed action including: (i) The category of the proposed action; (ii) The rationale for using the category and, if more than one category could have been used, why the specific category was chosen; (iii) A finding that no extraordinary circumstances exist." *Id*. at § 220.6(f) (defining the contents of a Decision Memo).

The Forest Service concluded the Projects fell within CE-4 because the purpose of the Projects was to maintain the road—ensuring that the road is free from and unobstructed by fallen trees burned and damaged by the fire. But EPIC argues the Projects do not fit under CE-4. In interpreting CE-4, it contends that the scale of the project far exceeds the minor projects contemplated by CE-4. EPIC relies on *ejusdem genris*[1]: the examples illustrative of CE-4's application involve minor maintenance such as pruning vegetation, grooming the surface of a trail, and clearing roadside brush without the use of herbicides, etc.

However, *ejusdem genris* has far less, if any, force when the list of examples follows the words "including, but not limited to." *United States v. Migi*, 329 F.3d 1085, 1089 (9th Cir. 2003). Here, the Projects would appear to fall within the limited scope of CE-4. The purpose of the Project of clearing the roads and assuring they remain unobstructed by burned and damaged trees is to maintain the roads. The spirit of CE-4 is not violated by the logging because of the numerous limitations the Forest Service put on the Projects—for example, the boundary of the designated treatment area must be 200 feet (*i.e.*, double the average tree height of 100 feet) from the centerline of the road, and trees may not be felled unless they are one-and-one-half tree height's

---

[1] *Ejusdem generis* requires that "when a general word or phrase follows a list of specific . . . things, the general word or phrase will be interpreted to include only persons or things of the same type as those listed." BLACK'S LAW DICTIONARY 535 (7th ed. 1999).

6

distance[2] from the road and have a 50% chance of mortality.[3] These limitations ensure that only trees that actually have a risk of falling and reaching the road are felled; the limitations serve to prevent a free-for-all harvest.

Because the Forest Service has decided to implement the road maintenance Projects by contracting with vendors to salvage merchantable trees designated for removal by the Forest Service, EPIC contends the Project is in essence a salvage operation with merchantable trees to be harvested by vendors for profit and thus CE-13, not CE-4, applies. If it does, CE-13's acreage limitation of 250 acres applies. EPIC also argues that the acreage limitation should be imported into CE-4. District court decisions regarding the tension between CE-4 and CE-13 are split. While there is one case that supports EPIC's position, recently-decided cases are in the Forest Service's favor. The Forest Service cites the Court to *Earth Island Institute v. Elliot*, 318 F. Supp. 3d 1155 (E.D. Cal. 2018). EPIC relies on *Los Padres Forestwatch v. U.S. Forest Service*, No. CV-08-845- GW (MANx), Slip. Op. (C.D. Cal. July 3, 2008). Both courts in *Earth Island* and *Los Padres* dealt with the issue currently before this Court.

In *Los Padres*, decided in 2008, the district court rejected the defendant's conclusion that commercial logging of dead trees along roadsides fit under CE-4 as road maintenance instead of CE-13, which limits salvaging to 250 acres. The *Los Padres* court found the "acreage at issue is a key factor in determining whether a project necessitates at least the completion of an EA prior to proceeding. If the Road Maintenance [] CE[] were to trump the Tree Salvage CE, acreage-limitations would be meaningless so long as the acres affected were within falling-distance of roads or administrative-recreational sites." *Los Padres*, No. CV-08-845- GW (MANx), Slip. Op. at 16–17 (emphasis in original). *Los Padres* concluded that the acreage limitation in CE-13 applies to CE-4 because the mere existence of the limitation shows that the agency did not intend

---

[2] The extra half-tree height compensates for variables such as wind, force of breakage, and steep slopes, etc. Docket No. 52 ("Supplemental Declaration of Anthony Saba"), at ¶¶ 9–10.

[3] The Forest Service selected the 50% probability of mortality ("PM") threshold because "considering the important safety objectives at stake on these roadways . . . [,] by utilizing this PM, [it] can more efficiently achieve the Project's goals by reducing the number of entries into the Project area to mitigate future mortality." *Id.* ¶ 7.

7

salvage timber sales above 250 acres to be categorically excluded from environmental review. *Id*. at 18. EPIC argues this is so because CE-4 requires no Decision Memo,[4] which suggests it is for projects that are presumed to have less significant impacts, whereas projects undertaken by CE-13 require such memoranda.[5] Based on the existence of an acreage limitation in CE-13, the court concluded that "the Forest Service has already determined that it cannot be categorically concluded that the salvage/harvest of dead or fire damaged trees from an area in excess of 250 acres will not have significant effect on the environment." *Id*. at 18.

But more recently, in *Earth Island*, a district court considered *Los Padres* and rejected its conclusion. *Earth Island Inst. v. Elliott*, 318 F. Supp. 3d 1155, 1173–74 (E.D. Cal. 2018), *appeal dismissed as moot*, 775 F. App'x 312 (9th Cir. 2019). There, the court was similarly confronted with the question of "whether the removal and commercial sale of hazard trees along 52.1 miles of road may properly be classified as "road maintenance." *Id*. at 1173. The *Earth Island* court noted there were district court decisions both predating and postdating *Los Padres* that upheld the use of CE-4 under similar circumstances. *Id*. (citing *Native Ecosystems Council v. Krueger*, No. CV 13-167-M-DLC, 2014 WL 9954189, at *10 (D. Mont. June 4, 2014) [authorization of project removing trees within 150 feet of roads based on consideration of whether the tree is expected to fall onto the roadway or cause another tree to fall was not considered a free-for-all of commercial logging]; *Forest Conservation Council v. U.S. Forest Serv.*, No. CV-03-0054-PCT-FJM, 2003 WL 23281957, at *3 (D. Ariz. July 9, 2003), *aff'd*, 110 F. App'x 26 (9th Cir. 2004) [holding that "removal of dead trees within 150 feet of fences is generally within the scope of the repair and maintenance of roads, trails, and landline boundaries"]). The *Earth Island* court concluded that an

---

[4] Here, the Forest Service did not prepare Decision Memos for these Projects. *See* AR 1–51; 449–549 ("Given the purpose and need, the deciding official determined that this action is categorically excluded from documentation in a Decision Memo (DM), an environmental impact statement (EIS), or an environmental assessment (EA) . . . There are ***no extraordinary circumstances*** that would warrant further analysis and documentation in a DM, EA, or EIS.") (emphasis added).

[5] In 2008, when answering public comment on these regulations, the Forest Service responded "[w]hile some [] categorical exclusions of ***limited scope*** do not require a decision memo or project record, a majority of the Forest Service's categories do require preparation of a decision memo and a supporting record." 73 FR 43084-01 (emphasis added). This supports EPIC's position that those which fall under CE-4 have a presumption of minor impacts on the environment.

agency's interpretation of its own regulation is entitled to deference and the Forest Service's decision to remove hazard trees that may damage roads under CE-4 was not plainly erroneous or inconsistent with the regulation. *Earth Island*, 318 F. Supp. 3d at 1176. It specifically found CE-4's definition of road maintenance included abating hazard trees that may fall on a road. *Id*.; *see also Earth Island*, 290 F. Supp. 3d 1102 (E.D. Cal. 2017) (denying preliminary injunction).

While there is logical force to the court's analysis in *Los Padres*, *Earth Island* is more persuasive. Pivotal to its analysis is the acknowledgement that under established principles of administrative law, the Forest Service's interpretation of its regulations is entitled to deference. As the Ninth Circuit has held, "[a]n agency's determination that a particular action falls within one of its categorical exclusions is reviewed under the arbitrary and capricious standard." *Alaska Ctr. for Environment v. United States Forest Service*, 189 F.3d 851, 857 (9th Cir.1999). "[A]n agency's interpretation of the meaning of its own categorical exclusion should be given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation." *Id*. Indeed, applying a deferential standard, the Ninth Circuit in an unpublished memorandum affirmed the Forest Service's tree-removal project under categorical exclusion for clearing roads because it was not arbitrary and capricious. *Council v. U.S. Forest Serv.*, 110 F. App'x 26 (9th Cir. 2004).

The Forest Service's interpretation finding CE-4 applicable here is not arbitrary and capricious. As noted above, the parameters of the Projects are entirely consistent with its stated purpose of maintaining unobstructed roads, a purpose within literally the scope of CE-4. Moreover, because there is an urgency where road clearance and maintenance is at stake, it is logical that such projects fall within category (d) rather than (e)'s potentially time-consuming requirement of a formal Decision Memo. Additionally, even though there is no acreage limitation, the road maintenance purpose will require that felling of trees hew reasonably close to the road, thus imposing a meaningful limit against a free-for-all harvest. The fact that the Project involves salvaging of dead and damaged trees posing a risk of road obstruction is contracted out to salvagers does not subvert the purpose of the Project. Nor, as discussed below, does that fact inherently increase the impact on the environment. Finally, the 250-acre limitation cannot easily

9

be imported where CE-4, unlike CE-13, omits it. The Forest Service's interpretation of CE-4 is not arbitrary.

EPIC has not shown a likelihood of success on the merits. *See Heredia v. Santa Clara Cty.*, No. C-06-04718 RMW, 2006 WL 2547816, at *2 (N.D. Cal. Sept. 1, 2006) (denying a motion for preliminary injunction because "[g]iven the unsettled legal landscape, plaintiffs here cannot demonstrate a likelihood of success on the merits . . . .").

B. <u>Irreparable Harm and Balance of Hardship</u>

EPIC argues logging ecologically critical habitat will inflict irreparable injury. In support of this position, it contends it, and its members, will no longer be capable of experiencing those areas in the habitat's undisturbed/unlogged state.

In the declaration of Kimberly Baker, a member of EPIC, Ms. Baker declares that she obtains "personal and professional enjoyment, fulfillment, and satisfaction when visiting naturally recovering post-fire forest ecosystems and watersheds that have not been damaged by logging." Docket No. 12 ("Baker Decl.") ¶ 9. Moreover, she further declares that

> If the logging occurs as planned, my enjoyment of these areas will be greatly diminished. It would be difficult to avoid these areas as they stretch for thousands of acres. I will be emotionally harmed because of the nearly irreparable harm to habitat connectivity and suitability and because of the loss this important forest structure on the landscape, which would be visible for miles. However, if the Forest Service were to prepare an Environmental Assessment or Environmental Impact Statement, it would have to include alternatives to the planned logging. Alternatives (based on my and others' comments) could include leaving the living trees standing, retaining more trees on the downhill side of the road and some of the downed hazard logs on the ground, which would be extremely helpful to wildlife and soil health and improve my enjoyment of the affected areas if such alternatives were chosen. And it would make it more likely that mitigation measures would be put in place to support species survival, soil health and water quality, which would increase my enjoyment of these rejuvenating post fire landscapes.

*Id.* ¶ 13. Ms. Baker also submits two research articles that address the effects of logging on post-fire landscapes as well as the northern spotted owl's reliance on burned patches of forest for foraging. *See id.*, ¶¶ 11, 12 & Attachments B & C. EPIC did not submit any expert declaration.

In opposition, the Forest Service rejects the notion that logging gives rise to *per se* irreparable harm. *Earth Island*, 290 F. Supp. 3d at 1124 (citing *Earth Island Inst. v. Carlton*, 626

10

F.3d 462, 474 (9th Cir. 2010) (finding "objectively minimal" harm where the project would fell dead and dying trees in low-quality habitat within 300 feet of roads, leaving 88% of the fire area untouched). Moreover, the Forest Service conducted a "Determination of Extraordinary Circumstances" and concluded that while the northern spotted owl's habitat may be modified, it would either not be adversely affected (*i.e.*, would not render the habitat unsuitable) or the specific project at issue would not overlap with their habitat. AR 1–51 ("[d]ue to the narrow linear nature of the project and the abundance of dead trees outside project boundaries, . . . [s]ensitive species would not be adversely affected."). The Forest Service further represents that it mitigated the environmental impact of the Projects because, as noted earlier: (1) the Projects will fell dead and dying hazard trees within 200 feet (double the average height of trees within the Projects) of the centerline on either side of high-priority, pre-existing roads; (2) the trees will only be removed if they qualify for removal under the Forest Service's marking guidelines (under which only trees with a 50% or greater chance of mortality, among other things, are marked); (3) the overwhelming majority of the Ranch Fire area will not be treated under the Projects—the Projects will impact 1.6% of the burn area. Opp. at 20–21 (citing Carlson Decl. ¶¶ 5, 8, 13–15; AR 1–51; 449–549). Moreover, only marked trees within 1.5 times their height from the roadway will be felled. These requisites are articulated in the Forest Service's guidelines, entitled, "The Ranch Fire Roadside Hazard Tree Removal Project Marking Guidelines," (AR 440–41) prepared by Tony Saba, a Forester/Silviculturist. It provides:

> Fell and remove all merchantable hazard trees 14"+ DBH according to the Hazard Tree Guidelines for Forest Service Facilities and Roads in the Pacific Southwest Region (Angwin et al., 2012). Ensure those trees are within one and a half tree-heights of the road. Follow the Marking Guidelines for Fire-Injured Trees in California (Smith et al. 2011) and remove all merchantable trees 14"+ DBH with a 50% or higher probability of mortality within the 200' road buffer. Follow the guidelines based off of % crown scorch killed by species as the 50% or higher probability varies depending on species. Removing these trees within the 200' road buffer will assist in negating future heavy fuel loads. Any trees with green foliage and ambiguous relative to falling within the Fire-Induced Mortality Guidelines will be marked with blue paint.

AR 440–41. EPIC argues that an alternative option exists, and an environmental review would have forced the Forest Service to consider it: "[o]nly trees that are completely dead (*i.e.*, *not one*

11

*green needle*) will be harvested . . . ." Reply at 10 (emphasis in original). It then cites to numerous figures relating to percentages of trees that were still alive when felled.[6] It also relies on an article attached to its declaration, which states that "[e]ven within high-severity fire areas, considerable numbers of overstory trees can survive the fire, often containing no green needles immediately after fire . . . ." Baker Decl., Ex. B at 9.

But EPIC does not specifically challenge—with countervailing scientific data—the Forest Service's reliance on or the accuracy of the Marking Guidelines for Fire-Injured Trees in California (Smith et al. 2011) or its Marking Guidelines (AR 449–549) in selecting 50% risk of mortality as the benchmark to fell trees. EPIC argues removing live trees that may survive constitutes irreparable injury—*i.e.*, it objects to the Forest Service's decision to mark trees with 50% chance of survival for removal. But the risk of trees with a 50% risk of dying posing a hazard is substantial. Moreover, as noted, the Marking Guidelines establishes a reasonable set of additional limitations for felling trees: the tree must be (1) fourteen inches in diameter breast height, (2) within two-hundred feet of the centerline of the road, and (3) within one and a half tree-heights from the road. Supplemental Declaration of Anthony Saba, at ¶ 10. The Forest Service represents these marking guidelines as "well-grounded in science, based on regional standards developed by the Forest Service," Opp. at 5–6; "a court generally must be 'at its most deferential' when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA." *Native Ecosystems Council*, 697 F.3d at 1051. The Forest Service found that no extraordinary circumstances warranted further NEPA review, which included, among other things, impacts on endangered, threatened, or sensitive species, as well as floodplains, wetlands, municipal watersheds, and riparian reserves. AR 1–51.

As noted above, EPIC's primary objection is focused primarily on the fact that the Forest Service is prioritizing the felling/logging of merchantable trees. Yet, the Forest Service describes the commercial aspect of the Projects as important because (1) removing larger, merchantable

---

[6] "[M]any of the trees in the Bartlett timber sale were alive, but still marked for felling . . . . between 25 to 50 percent of the trees over 20 inches in diameter proposed for felling are live trees[, and] about 25% in M5 and M10 are alive (AR 1022–32, AR 760–88, respectively), and over 50% in Deer Valley are alive (AR 904–18)." Reply at 10.

12

trees is more difficult and expensive, so it needs third-party contractors for economical and efficiency purposes; and (2) the revenue brought by these commercial sales provides the Forest Service with the means to subsequently remove the smaller, non-merchantable trees. Docket No. 43 ("Supp. Opp.") at 2.

At the hearing, EPIC took issue with the damage resulting from the removal of felled trees—*e.g.*, damage to the soil from tractors and other heavy machinery. It contends felled trees should be left in the forest floor and not removed. But EPIC has submitted no substantive or scientific evidence that removal of the trees poses a greater hazard than non-removal. The Forest Service points out that leaving felled trees on the forest floor may impede future reforestation, increases fire hazard, and poses safety hazards to, *e.g.*, future firefighters.

EPIC fails to establish any significant public harm given the limitations imposed by the Forest Service in the proposed road maintenance projects affecting only 1.6% of the burn area. EPIC has not established the balance of hardships tips sharply in its favor. Nor does it establish the public interest warrants a preliminary injunction.

C.  Public Interests

The parties and amicus SPI have asserted multiple competing interests, some of which could be considered public: (1) EPIC's interest in protecting ecologically-critical areas of the environment and its ability to enjoy the habitat in its unlogged state; (2) the Forest Service's interest in protecting the public from serious safety concerns (*e.g.*, trees falling on public roads) and the merchantability of the trees (*i.e.*, as time passes, the decaying trees will further decay, thereby becoming less commercially valuable); and (3) SPI's economic interest in salvaging the trees. With respect to (2), the Forest Service also argues that if the Court grants EPIC's preliminary injunction motion, the rainy conditions in winter will make salvaging the damaged trees unsafe because of the rainfall and the condition of the soil caused by moisture, in addition to the condition of the further-decayed trees. *See Conservation Cong. v. U.S. Forest Serv.*, 774 F. App'x 364, 368 (9th Cir. 2019) (affirming district court's denial of injunctive relief and its finding that "steps to prevent treacherous road conditions caused by fire-killed trees falling on and obstructing public roads, and in mitigating the intensity and severity of future fires outweighs the

13

public interests that support an injunction.") (internal citations omitted); *Carlton*, 626 F.3d at 475–76 (affirming district court's denial of injunctive relief where it concluded "safety concerns" posed by roadside hazard trees to the general public and forest employees "weighed in favor of not issuing the injunction"); *Earth Island*, 290 F. Supp. 3d at 1126 (denying preliminary injunction and explaining that the public interest "tips strongly against granting" injunctive relief given "the very serious safety concerns related to removal of hazard trees near roads and recreation sites.").

The public interests asserted herein do not change the balance of hardship.

## V. CONCLUSION

In sum, EPIC has not established much, if any, irreparable harm. To the extent it has established some potential harm, EPIC has failed to demonstrate that the balance of hardship tips sharply in its favor. As it has not established a likelihood of success on the merits, the request for preliminary injunction must be **DENIED**. "The Ninth Circuit has 'declined to adopt a rule that any potential environmental injury automatically merits an injunction,' especially where a court finds that the plaintiffs are unlikely to succeed on the merits of their claims." *The Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008).

This order disposes of Docket No. 11. This order also lifts the TRO (Docket No. 42).

**IT IS SO ORDERED**.

Dated: December 4, 2019

_____
EDWARD M. CHEN
United States District Judge